THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JOSEPH J. KOSIK, Defendant-Appellant.

First District (1st Division)   No. 81—1233

Opinion filed November 29, 1982.—Rehearing denied January 5, 1983.

Louis B. Garippo, Ltd., of Chicago (David A. Novoselsky, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Kevin Sweeney, and Daniel E. Jordan, Assistant State's Attorneys, of counsel), for the People.

JUSTICE O'CONNOR delivered the opinion of the court:

Defendant Joseph J. Kosik was convicted of armed violence and aggravated battery after a jury trial. He was sentenced to a term of six years for the armed violence conviction. He appeals, contending (1) identification testimony should have been suppressed because of a suggestive in-court identification during the preliminary hearing; (2) identification testimony at trial was insufficient as a matter of law; (3) the State's theory of accountability was not proved beyond a reasonable doubt; (4) he was denied due process of law by the State's suppression of information within its possession; (5) testimony of the investigating officer was improper hearsay testimony used to bolster a weak identification of defendant; and (6) the conviction and sentence based on the charge of armed violence must be vacated.

On July 22, 1979, four men were standing on the northwest corner of Division Street and Cicero Avenue in Chicago at about 1 a.m. A dark colored car made a left-hand turn onto Division Street from the northbound lane of Cicero Avenue. Shots were fired from the pas-

senger side of the car. As a result of the shooting, Saul James, Jr., was paralyzed below the waist.

The key witness for the State during the trial was Charles Lemon. He was one of the men standing on the corner at the time of the shooting. He is also the victim's cousin. Lemon testified that he observed a black Buick Century, with two people in it, pass through the intersection. He also observed that there was a little flower, or flowers, hanging from the rear view mirror. He heard shots fired and fell to the ground. He saw the license plate on the car as it traveled westbound on Division Street. It had the letters "JJK" and the first number was a "2." There were six to eight shots fired. Lemon testified that the incident did not last a long time, alternately saying six to seven seconds or 10 to 15 seconds.

Lemon testified that, after leaving the hospital where his cousin was taken, he went back to the scene of the shooting to look for the car from which the shots were fired. In his own car he traveled west to Central Avenue and then drove back to Cicero Avenue on the next street. He traveled back and forth between Cicero and Central Avenues until he reached St. Paul Street. On this street he found the car he was looking for near the intersection of St. Paul Street and Cicero Avenue. He felt the car's hood and engine. Both were hot. He observed the car from a short distance until he saw somebody come out of a nearby house. Lemon recognized this individual as the driver of the car at the shooting incident. He also stated that the person he saw was the defendant. Later in the day, he again observed defendant come out of the same house. After he followed him around the block, Lemon testified, he saw defendant talking with another person he identified as the passenger who fired the shots.

During his testimony Lemon said that he identified a photograph of defendant from an array of seven or eight photographs shown to him by Chicago Police Officer Mook. In that photograph defendant looked the same as he did on July 22, 1979. Lemon also identified photographs of defendant's car and the license plate from that car. On cross-examination, Lemon admitted that he failed to identify defendant at a lineup.

The victim, Saul James, Jr., also testified at trial that he saw a black Buick Century in the turn lane on Cicero Avenue. He stated that the car turned slowly and shots were fired from the front seat of the car. He also remembered that the license plate started with "JJK" because his last name starts with a "J." James stated that he viewed both occupants of the car at the time of the shooting. He had a profile view of the right side of the driver. He described defendant

as having curly long hair, with a beard. He indicated he saw defendant the first time he had gone to court in this matter. At that time defendant had shaved. James made an in-court identification of defendant as the driver of the car.

On cross-examination, James stated there were two lines of fire. He gave his first description to the police after his second operation, over 2½ weeks after the incident. He never told the police about the two lines of gunfire. James also stated that the car was stopped for five to 10 minutes at the most. There were at least six shots fired before the car stopped. He stated he could only make a tentative identification of defendant when he was shown an array of photographs by the police.

James Boyking and Lee Dean were the other two men at the intersection during the incident. Boyking stated that the car was a two-door hardtop and it could have been black. He could not make an identification of anyone in the car, other than the fact the two occupants were white males. He estimated the incident took "about a second." He never saw the car stop. He stated that about four to six shots were fired in rapid succession.

Lee Dean testified that he fell to the ground when he heard one or two shots. He said the shots were fired until the gun was empty and the clicks of the empty gun chamber could be heard. As the car completed its turn, he noticed the brake lights go on and then off quickly. He described the car as a black or dark blue Regal or Century. It was a two-door car with opera side windows.

During cross-examination, Dean stated that the car never appeared to stop. He testified that the whole incident, from the time he first saw the car until it left his sight, took one to two minutes, perhaps less. He also stated that he was visited by a police investigator about two weeks after the incident. He was shown some photographs of cars and he identified one as looking like the car he saw the night of the incident. Dean said the investigator wrote down what he had to say.

Detective Edmund Mook was the Chicago police officer who investigated the shooting incident. He said he talked to Saul James four to six days after the incident in the hospital. He testified to what James told him. James described two white males in the car from which two shots were fired. The driver was described as being in his twenties, with dark hair and a moustache. The car was described by James as being dark colored, dark green, black or dark blue. It was a 1975 or 1976 model Buick Century with opera windows. Detective Mook testified that James remembered two letters from the license plate, "JJ."

Detective Mook stated he talked to Lemon relative to the incident on August 4 or 5. Lemon gave him the license plate number "JJK 235" as belonging to the car at the incident. Mook found this number was registered to defendant at an address on St. Paul Street. Mook talked with defendant at Area 5 headquarters on August 25, 1979. At that time, he had a picture of defendant taken. Defendant was asked to come back on August 27. Mook stated that defendant did not come back on that date.

Mook identified defendant in court as the person he had a picture taken of in Area 5 headquarters. He stated that defendant looked different at trial, having shaved a moustache and cutting his hair shorter. Mook then testified that he showed a series of photographs to Lemon. Out of these photographs, which were marked as exhibits for the State, Mook stated Lemon identified a photograph of defendant. Mook further stated, though, that Lemon failed to identify defendant in a lineup. Lemon did, however, identify several pictures of defendant's car.

On cross-examination, Mook stated Lemon told him he only had a partial license plate number at the time of the incident, he had gone looking for the car in the neighborhood and had seen the person who had done the shooting. Mook admitted he did not include these statements in any of his written reports. He also stated that James failed to make an identification of defendant when shown an array of photographs.

Upon redirect examination, Mook said the photographs were shown to James when he was in the hospital; that James picked out a photograph he was not sure of; that this was a photograph of defendant; and that James was in serious condition at the time of the viewing. Again, on re-cross-examination, Mook admitted he failed to include in his report the fact that James was unsure of his identification of defendant's photograph.

Defendant testified in his own behalf at trial. He admitted that he owned a 1975 Buick Century with license plates "JJK 235" but denied being in the area of Division Street and Cicero Avenue at the time of the incident. He testified that on the evening of July 22, 1979, he went to a lounge looking for his friends with whom he was involved in a softball tournament the next day. He left the lounge about midnight or 12:15. When he got home, his parents were not in. Defendant denied any involvement in a shooting that night.

On cross-examination, defendant said the lounge he went to is a 10-minute ride from his home and that Division Street and Cicero Avenue is about seven blocks from his home. He admitted he had a

poppy or "donut thing" which he received from a Veteran's Day handout or similar event. He also identified certain photographs as those of his car.

He stated that he had a moustache and his hair was longer at the time of the incident. On August 25, 1979, when his picture was taken by Detective Mook, he had a moustache and beard. He testified that he periodically shaved this off, which he did a day or two after talking with Detective Mook.

Several witnesses testified to defendant's good character and reputation in the community. One witness was with defendant in the lounge early in the evening of July 22, 1979. He testified defendant was not intoxicated at the time. He did not leave with defendant that night and he did not know where defendant went after leaving. Dr. Ralph Haber, a Ph.D. and professor in psychology, testified to the effects that light, time and violence have on human perception and memory.

Defendant's attorney during the preliminary stages of this case, Walter Donat, also testified. He attended a lineup in which defendant participated. Charles Lemon was present to observe this lineup. Donat testified that Lemon could not identify anyone in the lineup. A second lineup, with the same people, was held the same day a short time later. Again Lemon could not identify anyone. Donat also stated he represented defendant at the preliminary hearing and testified that, with defendant standing at his side before the bench, an identification of defendant was made.

The record of the proceedings for the preliminary hearing shows that defense counsel made a motion to allow defendant to sit in the gallery and to exclude the witnesses. The basis of this motion was to avoid prejudice, in that it was asserted there had not been an identification of defendant at a lineup. The State countered, arguing there had been an identification by the victim at the scene and that the motion was more properly the subject of a later motion to suppress identification. At this hearing, James testified to the extent of his injuries and that he received them during the shooting incident. James was not asked to identify defendant. Questions by defense counsel as to the circumstances of the shooting were not allowed as beyond the scope of direct examination. Although James stated that defendant did not shoot him, he did say, "His friend shot me."

Charles Lemon identified defendant at the preliminary hearing. He also described the car at the incident as a 1975 or 1976 black Buick Century. Cross-examination as to his opportunity to see the license plate number was prohibited upon objection by the State.

Lemon did state that the car stopped for about a minute.

Prior to trial, a hearing on defendant's motion to suppress was held. Defendant argued that the identification procedures at the preliminary hearing were suggestive and that the court had been misinformed as to prior identifications. The court heard testimony from James and Detective Mook. James identified defendant but also stated that he did not identify a picture of defendant when shown an array of photographs by Detective Mook. Mook testified that he received a description of the assailants from Charles Lemon approximately a week after the incident. He stated that a photograph identification of defendant was made prior to the preliminary hearing. After entertaining arguments from counsel, the court denied the motion to suppress.

Defendant argues the court erred when it denied his motion to suppress the identification testimony. He contends the identifications made at the preliminary hearing were made under suggestive conditions, therefore denying him a right to a fair trial. The suggestive nature of a preliminary hearing identification was recognized in *Moore v. Illinois* (1977), 434 U.S. 220, 54 L. Ed. 2d 424, 98 S. Ct. 458. (*People v. Torres* (1981), 100 Ill. App. 3d 931, 427 N.E.2d 329, *appeal denied* (1982), 88 Ill. 2d 554.) In *Moore*, the Supreme Court held that "petitioner's Sixth Amendment rights were violated by a corporeal identification conducted after the initiation of adversary judicial criminal proceedings and in the absence of counsel." (434 U.S. 220, 231, 54 L. Ed. 2d 424, 435, 98 S. Ct. 458, 466.) The case was reversed and remanded for a determination of whether this violation was harmless constitutional error. Defendant contends there are remarkable factual and legal parallels between *Moore* and this case.

In *Moore*, the defendant appeared at a preliminary hearing without representation of counsel. He stood before the bench as the charges were read and the victim called to testify. The victim identified Moore as her assailant. In her testimony at trial she was allowed to testify that she had identified Moore at a preliminary hearing. The court noted that "[i]t is difficult to imagine a more suggestive manner in which to present a suspect to a witness for their critical first confrontation than was employed in this case." (434 U.S. 220, 229, 54 L. Ed. 2d 424, 434, 98 S. Ct. 458, 465.) In a footnote, the opinion suggested that with counsel (1) a continuance might have been obtained until a proper lineup had been conducted, (2) an order might have been obtained requiring the victim to remain out of the courtroom until her testimony was sought or permitting the accused to be seated among the spectators while he was in the presence of the victim until she had attempted an identification, or (3) counsel might have cross-

examined the victim to test her identification before it hardened. 434 U.S. 220, 230 n.5, 54 L. Ed. 2d 424, 435 n.5, 98 S. Ct. 458, 465-66 n.5; see also *People v. Stingley* (1978), 65 Ill. App. 3d 768, 382 N.E.2d 861; *People v. Bolden* (1978), 59 Ill. App. 3d 32, 374 N.E.2d 1307, *appeal denied* (1978), 71 Ill. 2d 618.

■ Defendant points out that he was represented by counsel at the hearing and precautions were requested. He argues that the refusal to take the precautionary steps led to a suggestive identification procedure. The State takes the position that *Moore* is not applicable to this case and that, in any case, there was no violation since defendant was represented by counsel. While the State's position is untenable, we are not constrained to make a *per se* application of *Moore* as defendant seems to argue.

The same footnote suggesting possible precautions to be taken at preliminary hearings also stated that such requests are within the sound discretion of the preliminary hearing court. (*Moore v. Illinois* (1977), 434 U.S. 220, 230 n.5, 54 L. Ed. 2d 424, 435 n.5, 98 S. Ct. 458, 465-66 n.5.) On the motion to suppress here, the trial court was presented with the circumstances of the identification made at the preliminary hearing. We cannot say the court's denial of the motion or the preliminary hearing court's refusal to take the procedures requested was an abuse of discretion.

Defendant next contends the identification testimony at trial was weak and insufficient as a matter of law. He points to several factors supporting this argument, urging us to consider (1) two eyewitnesses, Boyking and Dean, were unable to identify anyone in the car during the incident, (2) the identifications of both James and Lemon are based solely on a profile view while looking into a moving vehicle, (3) the duration of the incident was a short time, just a matter of seconds rather than minutes, and (4) James' testimony is contradictory and self-contradictory.

Defendant compares the facts of this case to those found in *People v. Cullotta* (1965), 32 Ill. 2d 502, 207 N.E.2d 444, where the Illinois Supreme Court reversed a conviction based upon identifications made by two police officers. In that case, the police officers' opportunity to view the defendant occurred as they drove by a laundromat during a snowstorm. The court further found fault with these identifications because they occurred more than an hour before the crime. 32 Ill. 2d 502, 505.

■ The supreme court reiterated the rule that a conviction cannot stand if an identification is vague, doubtful and uncertain. (32 Ill. 2d 502, 504.) Where "the evidence is irreconcilably conflicting, it is

the peculiar prerogative of the trier of fact *** to ascertain the truth." (*People v. Hammond* (1970), 45 Ill. 2d 269, 278, 259 N.E.2d 44.) A reviewing court may not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of witnesses unless the evidence is so improbable as to raise a reasonable doubt of guilt. *People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513; *People v. Wade* (1977), 51 Ill. App. 3d 721, 366 N.E.2d 528, *appeal denied* (1977), 66 Ill. 2d 641; *People v. McIntosh* (1979), 70 Ill. App. 3d 188, 388 N.E.2d 142.

Although the entire incident occurred quickly, both James and Lemon were positive in their identifications of defendant at trial. Lemon identified defendant's picture to Detective Mook when shown an array of photographs. The incident occurred at an intersection well lighted by street lights on every corner. James and Lemon were able to see the license plate number of the car. James recalled that the license number started with the letters "JJ." Lemon also remembered a partial number and was able to find the car in his search several hours after the incident. Lemon also was able to observe a little flower hanging from the rear-view mirror of the car at the incident. We are of the opinion that there was sufficient credible evidence for the jury to conclude defendant was the driver of the car.

▪ Defendant asserts the evidence is insufficient to prove that the driver of the car is legally accountable for the acts of the passenger. At best, he argues, the State's evidence proves nothing more than the driver's presence at the scene and the fact that he did not stop the car after the shots were fired by his passenger. He then argues that mere presence at the scene and flight, without other circumstances showing a common design to do an unlawful act, does not establish accountability. He relies on *In re Woods* (1974), 20 Ill. App. 3d 641, 314 N.E.2d 606, *appeal denied* (1974), 56 Ill. 2d 591, *People v. Ivy* (1979), 68 Ill. App. 3d 402, 386 N.E.2d 323, *People v. Lopez* (1979), 72 Ill. App. 3d 713, 391 N.E.2d 105, and *People v. Dorris* (1980), 90 Ill. App. 3d 707, 413 N.E.2d 441, *aff'd sub nom. People v. Evans* (1981), 87 Ill. 2d 77.

In *People v. Torres* (1981), 100 Ill. App. 3d 931, 427 N.E.2d 329, *appeal denied* (1982), 88 Ill. 2d 554, this court was presented with circumstances similar to those in this case. There, two men drove by a group of children during evening hours and shot one of them. The entire incident occurred quickly as the car drove away. In response to defendants' argument that the evidence did not prove accountability, the court stated:

"To be accountable for the acts of another, one must have a specific intent to promote or facilitate the commission of a crime. (Ill. Rev. Stat. 1975, ch. 38, par. 5—2.) Such an intent can be proved by evidence that the defendant shared the criminal intent of the principal or that there was a community of unlawful purpose. The latter is shown by prior deliberation to commit the specific offense or by the spontaneous and combined participation of a group in the perpetration of the offense. (*People v. Bolden*; see *People v. Richardson* (1965), 32 Ill. 2d 472, 207 N.E.2d 478, *cert. denied* (1966), 384 U.S. 1021, 16 L. Ed. 2d 1023, 86 S. Ct. 1935.) Mere presence or negative acquiescence are insufficient to prove guilt. However, one may aid or abet without actively participating in the overt act; and if proof shows he was present at the crime without disapproving or opposing it, this conduct together with other circumstances can be considered by the trier of fact in concluding that such person assented to the criminal act, lent his countenance and approval and was thereby aiding and abetting the crime. (*People v. Nugara* (1968), 39 Ill. 2d 482, 236 N.E.2d 693, *cert. denied* (1968), 393 U.S. 925, 21 L. Ed. 2d 261, 89 S. Ct. 257; *People v. Clark* (1963), 30 Ill. 2d 67, 195 N.E.2d 157; *People v. Bartlett* (1980), 91 Ill. App. 3d 138, 414 N.E.2d 253.) Similarly, a close affiliation with the co-defendants after the commission of the crime, and a failure to report the incident is relevant to establishing accountability. *People v. Lopez* (1979), 72 Ill. App. 3d 713, 391 N.E.2d 105." 100 Ill. App. 3d 931, 938.

There was ample evidence to show that defendant aided and abetted the crime by creating conducive conditions and by failing to oppose or prevent its occurrence. (*People v. Torres* (1981), 100 Ill. App. 3d 931.) The evidence shows defendant was convicted beyond a reasonable doubt of armed violence and aggravated battery.

■ Defendant did not learn of Lemon's personal investigation during the early morning hours on the day of the incident until the commencement of the trial. During opening arguments, the prosecutor recounted the details of Lemon's search. Defendant also did not learn that James was unable to identify his photograph until the middle of the trial. None of this information was contained in any police report, particularly that of Detective Mook, the investigating officer.

Defendant charges that these factual matters relating to the identification of defendant were suppressed by the State and even misstated to the court and defense counsel at the preliminary hearing. He argues that this suppression of evidence denied him due process of

law. *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194; *People v. Nichols* (1976), 63 Ill. 2d 443, 349 N.E.2d 40.

In order to prove a *Brady* violation, it must be shown that the evidence was suppressed following a request for it by defendant and that the evidence was favorable to defendant and material either to guilt or to punishment. (*People v. Williams* (1980), 91 Ill. App. 3d 631, 414 N.E.2d 1235; *People v. Nichols.*) Materiality in a constitutional sense is not the mere possibility that the undisclosed information might have helped the defense or affected the outcome of the trial. (*People v. Williams.*) Omitted evidence is material if, when evaluated in the context of the entire record, it creates a reasonable doubt of the defendant's guilt. *People v. Williams; United States v. Agurs* (1976), 427 U.S. 97, 49 L. Ed. 2d 342, 96 S. Ct. 2392.

Detective Mook was identified as a prospective witness by the State in its discovery answer. The record does not reflect that defense counsel made any effort to interview Mook prior to trial. As a general rule, a witness will not be disqualified from testifying simply because the State, in good faith, did not draft memoranda of the witness' pretrial oral statements. *People v. Abbott* (1977), 55 Ill. App. 3d 21, 370 N.E.2d 286.

Furthermore, during his testimony, James was cross-examined as to his selection of defendant's photograph from an array. The testimony reveals that it was tentative at best. Detective Mook was also cross-examined on this point. He did not include this in his report because he did not think it imperative to do so. Before Lemon testified as to his search for the car, defense counsel was allowed to interview him about these facts. Defendant has not shown the materiality of the alleged violations. Nor do we believe the violations, if they do exist, create a reasonable doubt as to defendant's guilt.

Defendant next argues Detective Mook's testimony was hearsay improperly used to bolster the weak identification testimony of the eye-witnesses. First, we note defendant failed to object to the testimony at trial. Since he was effectively cross-examined by counsel we cannot say whether this was due to tactical considerations or simply to oversight.

■ Detective Mook testified generally to his investigation of this incident. On direct examination he also testified that Lemon identified a photograph of defendant but failed to make an identification at a lineup. On cross-examination he stated that James did not identify a photograph of defendant. This testimony was cumulative to that of James and Lemon themselves. In light of their testimony and the fact that all the witnesses were subject to cross-examination, we find the

admission of this testimony harmless. *People v. Robinson* (1978), 73 Ill. 2d 192, 383 N.E.2d 164.

■ Defendant finally argues that his conviction for armed violence must be vacated because of the "double enhancement" doctrine of *People v. Haron* (1981), 85 Ill. 2d 261, 422 N.E.2d 627. The State likens this case to *People v. Ross* (1981), 100 Ill. App. 3d 1033, 427 N.E.2d 955, *appeal denied* (1981), 85 Ill. 2d 560. In the latter case, we let stand a conviction for armed violence where the count did not specify which of two aggravated battery counts it was based upon.

In this instance, we agree with defendant's contentions. He was charged with several counts of aggravated battery based on different theories of aggravation, including the use of a deadly weapon. (Ill. Rev. Stat. 1981, ch. 38, par. 12—4(b)(1).) He was also charged with one count of armed violence based on the use of a handgun. This charge was specifically predicated upon aggravated battery (deadly weapon). *People v. Ross* is inapposite.

Therefore, defendant's conviction and sentence for armed violence are vacated. However, because the trial court did not sentence defendant for his aggravated battery conviction we remand the cause for a new sentencing hearing on that matter.

Affirmed in part; reversed in part; remanded for resentence.

GOLDBERG and McGLOON, JJ., concur.