2022 IL App (1st) 210189-U

No. 1-21-0189

Order filed September 7, 2022

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 13 CR 9811 |
| | ) | |
| ELEMO MOHAMED, | ) | Honorable |
| | ) | Michael B. McHale, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE BURKE delivered the judgment of the court.
Justices Gordon and Ellis concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Second-stage dismissal of defendant's postconviction petition is affirmed because defendant forfeited his claim of actual innocence and failed to make a substantial showing that the State violated *Brady v. Maryland*, 373 U.S. 83 (1963), and because he failed to establish that postconviction counsel provided unreasonable assistance.

¶ 2    Following a jury trial, defendant was found guilty of attempt first-degree murder and aggravated battery with a firearm and was sentenced to 38 years' imprisonment. We affirmed defendant's convictions on direct appeal. *People v. Mohamed*, 2018 IL App (1st) 160670-U.

Defendant filed a petition for postconviction relief, raising claims that (1) the photo array and lineup in which he was identified were impermissibly suggestive, (2) police coerced the victim, Tony Hemphill, into identifying him, (3) the State withheld Hemphill's statements to police in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and (4) trial counsel rendered ineffective assistance by not moving to suppress witness identifications of defendant. Defendant now appeals from the second-stage dismissal of his petition, contending that he made substantial showings of actual innocence and a *Brady* violation, and that postconviction counsel rendered unreasonable assistance. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4                                 A. Trial and Direct Appeal

¶ 5      Defendant proceeded to trial on one count of attempt first-degree murder (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2012)) and one count of aggravated battery with a firearm (720 ILCS 5/12-3.05(e)(1) (West 2012)) arising out of the shooting of Tony Hemphill on April 16, 2013. We previously detailed the evidence at trial in our order resolving defendant's direct appeal (see *Mohamed*, 2018 IL App (1st) 160670-U), so we will reiterate only those facts that are germane to the issues raised in this appeal.

¶ 6      Hemphill testified that he was driving a Nissan Murano near the intersection of North Artesian Avenue and West Devon Avenue at approximately 6:00 p.m. on April 16, 2013. It was a sunny day and still light out. Hemphill, who is blind in his left eye, drove into an alley and saw a BMW parked 30 to 40 feet away. Defendant, whom Hemphill identified in court, exited the driver's seat of the BMW and approached him. Hemphill had seen defendant in the area before but did not know him personally. Defendant was "skinny," approximately 5 feet 8 inches tall, and had

braided hair. Hemphill saw defendant fire a dark revolver toward him from approximately 20 feet away and heard 3 or 4 gunshots. Hemphill reversed his vehicle to the entrance of the alley, then moved to the rear seat and saw defendant approach the driver's side. Defendant fired 3 or 4 more shots from approximately 5 feet away and Hemphill felt a sharp pain on the upper right side of his chest. The gunshots stopped, so Hemphill returned to the driver's seat and saw defendant enter the BMW. Hemphill drove his vehicle into the BMW, causing it to crash into nearby garages. Three or four individuals, including defendant, exited the BMW and ran down the alley; Hemphill pursued them on foot armed with a bat from his trunk. Hemphill stopped when he realized that he had been shot in the chest and asked a person nearby to call an ambulance. He received treatment for his gunshot wound at a hospital.

¶ 7    Hemphill identified defendant to police in a photo array on April 18, 2013, and in a lineup on May 4, 2013. He identified the photo array and a photograph of the lineup, and the State moved them into evidence. The photo array depicts six young Black men, all of whom had relatively long hair in a braided or dreadlocks style. Hemphill initialed and dated defendant's photograph. The photograph of the lineup depicts four Black men seated on a bench, all of whom are wearing baseball caps, so their hairstyles are not visible. Prior to both identifications, Hemphill signed advisory forms that stated that he understood that the suspect may or may not be in the photo array or lineup, that he was not required to make an identification, and that he should not assume that the person administering the lineup knew which individual was the suspect. The State moved these advisory forms into evidence as well. Hemphill testified that he had no doubt that defendant was the person who shot him on April 16, 2013.

¶ 8    Blas Ramirez testified that he was installing a sign in a parking lot on the 2400 block of West Devon on April 16, 2013. At approximately 6:00 p.m., he heard at least five gunshots and saw one man holding a bat chasing four other men down an alley. One of the four men who was being chased held a black revolver in his right hand. The man holding the revolver was approximately 5 feet 9 inches tall with a "skinny" build and braided hair. Ramirez saw the right side of that man's face for 4 to 6 seconds from approximately 75 feet away. On May 4, 2013, Ramirez viewed a lineup at the Area North police station. He told police that one of the people in the lineup looked like the man he saw holding the revolver, but he was "not for sure." Prior to viewing the lineup, Ramirez signed an advisory form, which the State moved into evidence. This advisory form is in Spanish; Ramirez testified that it contained the same admonishments as the advisory forms that Hemphill signed. At trial, Ramirez recognized a photograph of the lineup but could not remember which person he identified. Ramirez testified that he did not see the man with the revolver in the courtroom and did not remember what that man looked like.

¶ 9    Chicago police detective Jose Gomez testified that he was assigned to investigate a shooting on the 2400 block of West Devon on the evening of April 16, 2013. At the scene, he saw a BMW and a Nissan Murano in an alley. Gomez recovered a driver's license belonging to defendant, whom he identified in court, from the center console of the BMW. On April 18, 2013, Hemphill described the shooter as a Black male with a medium complexion, a slim build, and braided hair. The same day, Hemphill identified defendant in a photo array as the man who shot him. Defendant was arrested on May 4, 2013, and Gomez placed him in a four-person lineup at the Area North police station. Gomez had all the lineup participants wear baseball caps because defendant, unlike the other participants, had braided hair. Hemphill viewed the lineup and

identified defendant as the person who shot him. Ramirez also viewed the lineup and identified defendant "as the person he saw running from the BMW with a handgun in his hand." Gomez identified defendant's driver's license, photographs of the scene, and swabs collected from the BMW, and the State moved all these items into evidence.

¶ 10    Officer Chris Maraffino testified that he arrested defendant, whom he identified in court, pursuant to an investigative alert on May 4, 2013, and transported him to the Area North police station.

¶ 11    The parties stipulated that Chicago police evidence technician Charles Sheppard collected swabs from the steering wheel, gearshift, and driver's door handle of the BMW on April 16, 2013, and inventoried them. Cook County State's Attorney police investigator Mary Ember testified that she collected a buccal swab from defendant, whom she identified in court, and transferred it to the Chicago Police Department. Ember identified the buccal swabs, and the State moved them into evidence.

¶ 12    Illinois State Police forensic scientist Greg DiDomenic was qualified as an expert in forensic science and DNA analysis and comparison. He testified that he conducted DNA testing on the vehicle and buccal swabs inventoried in connection with this case. DiDomenic identified a mixture of at least two DNA profiles on the BMW's steering wheel, gearshift, and driver's door handle. The major DNA profiles from all three locations matched defendant.

¶ 13    In closing, the State argued, in relevant part, that Hemphill identified defendant as the shooter multiple times and "without a doubt," and that Ramirez identified defendant as the man running with a firearm in his right hand shortly after the shooting. Defendant responded that Hemphill could not reliably identify him because Hemphill was blind in one eye and "in shock" at

the time of the shooting, and that Ramirez told Gomez that he was not sure whether defendant was the man that he saw holding a firearm. In rebuttal, the State contended that Hemphill had a clear view of defendant from a few feet away, and that Ramirez was not being truthful when he claimed to be unable to identify the man with the gun in court because he was upset about having to testify.

¶ 14   The jury found defendant guilty on both counts. Defendant filed a motion for a new trial, which challenged various evidentiary rulings and the jury instructions. The trial court denied this motion and sentenced defendant to 38 years' imprisonment on both counts, to run concurrently. The court denied defendant's motion to reconsider his sentence.

¶ 15   On direct appeal, we affirmed defendant's convictions over his arguments that the trial court abused its discretion by conditioning his cross-examination of Hemphill regarding gang membership upon whether defendant argued self-defense, by preventing defendant from impeaching Hemphill with his statement that he knew defendant's sister, and by refusing certain jury instructions. *Mohamed*, 2018 IL App (1st) 160670-U, ¶ 1.

¶ 16                    B. Postconviction Proceedings

¶ 17   In 2018, defendant filed a postconviction petition based on an affidavit from Hemphill, which, according to defendant, established that "Hemphill was improperly influenced and coerced to identify the defendant in the photo array, the live line-up and when he testified." Defendant claimed that Hemphill "expressed his confusion and uncertainty of his identification to the Detectives of the Chicago Police Department who interviewed him." Defendant argued that the State's failure to disclose Hemphill's statements to police violated *Brady*. Defendant also contended that the lineup and photo array in which Hemphill identified him were impermissibly suggestive because of his unique hair style, skin color, and facial structure, and that trial counsel

rendered ineffective assistance by not filing a motion to suppress those identifications. Hemphill's handwritten and notarized affidavit, which is attached to defendant's petition, is dated August 6, 2018, and states in its entirety:

"My name is Tony Hemphill I'm here at my own free will I have serious second thoughts that I identified the wrong person and the shooting that happen[ed] five years ago at the time the Chicago Police convienced [*sic*] me that they had the right person. They told me they had DNA and other witnesses despite my confusion I identified who they told me too [*sic*]. I was confused at the time and have serious doubts that I identified the wrong person. No one has forced or threaten[ed] me to write this."

¶ 18 The State filed a motion to dismiss defendant's petition, which argued that defendant forfeited his claims regarding the suggestive lineup and trial counsel's ineffectiveness because he could have raised those issues on direct appeal. The State also contended that defendant "fail[ed] to show that Hemphill's identification of [defendant] was coerced, that Hemphill testified falsely, or that the State failed to disclose exculpatory evidence." Defendant's response argued that his petition raised a claim of "constitutional error;" specifically, that Hemphill's identification of him was "coerced and false."

¶ 19 The circuit court granted the State's motion to dismiss. The court found that defendant's claims were directly rebutted by the record. It reasoned that Hemphill's affidavit did not claim that he identified the wrong person, that police threatened or coerced him, or that he testified falsely. The court explained that Hemphill's generalized doubts about the accuracy of his identification of defendant were not sufficient to proceed to the third stage of postconviction proceedings. With respect to defendant's *Brady* claim, the court found that "[n]o such statements [by Hemphill] have

been shown to exist." Finally, the court concluded that defendant forfeited his ineffective assistance claim by not raising it on direct appeal, and that the record established that the lineup and photo arrays were not impermissibly suggestive anyway. Defendant filed a motion to reconsider the dismissal of his postconviction petition, which the circuit court denied.

¶ 20    Defendant timely appealed.

¶ 21                                    II. ANALYSIS

¶ 22    On appeal, defendant contends that the second-stage dismissal of his petition should be reversed because he made substantial showings of actual innocence and a *Brady* violation, both premised on Hemphill's affidavit. In the alternative, defendant raises several claims of unreasonable assistance of postconviction counsel.

¶ 23    The Act provides a three-stage mechanism by which a criminal defendant may assert that his conviction was the result of a substantial denial of his constitutional rights. 725 ILCS 5/122-1 *et seq.* (West 2018); *People v. Myles*, 2020 IL App (1st) 171964, ¶ 17. The circuit court dismissed defendant's petition at the second stage. At the second stage, the circuit court must determine whether the petition and any accompanying documentation make a substantial showing of a constitutional violation or of actual innocence. *Myles*, 2020 IL App (1st) 171964, ¶ 17; *People v. Rosalez*, 2021 IL App (2d) 200086, ¶ 95. The circuit court may dismiss a petition at the second stage only if the allegations, liberally construed in favor of the defendant and taken as true, do not support a substantial showing of a constitutional violation or actual innocence. *People v. Sanders*, 2016 IL 118123, ¶ 31. We review the dismissal of a postconviction petition *de novo* (*id.*), meaning that we perform the same analysis that the circuit court would perform. *People v. Minniefield*, 2020 IL App (1st) 170541, ¶ 29.

¶ 24                                      A. Actual Innocence

¶ 25    Defendant first contends that Hemphill's affidavit establishes defendant's actual innocence. A defendant may raise a claim of actual innocence in a postconviction petition. *People v. Ortiz*, 235 Ill. 2d 319, 331 (2009). The evidence in support of the claim must be newly discovered, material, not cumulative, and of such conclusive character that it would probably change the result on retrial. *People v. Robinson*, 2020 IL 123849, ¶ 47. The State maintains that defendant has forfeited his claim of actual innocence because he did not raise such a claim in his postconviction petition. Under section 122-3 of the Act, "[a]ny claim of substantial denial of constitutional rights not raised in the original or an amended petition is waived."[1] 725 ILCS 5/122-3 (West 2018). We cannot excuse forfeiture caused by a defendant's failure to include an issue in his postconviction petition. *People v. Reed*, 2014 IL App (1st) 122610, ¶ 43.

¶ 26    Defendant's postconviction petition, which was filed by retained postconviction counsel, does not contain the term "actual innocence." His response to the State's motion to dismiss his petition does not mention actual innocence. Defendant's reply brief on appeal acknowledges that he "did not allege actual innocence as a subsection of his petition." Neither defendant's petition nor Hemphill's affidavit directly claims that defendant was not the shooter, or that someone else was. The record before us supports a conclusion that defendant did not allege actual innocence in his petition and, until now, has never claimed that he did.

---

[1] Although section 122-3 uses the term "waived," it is more accurate to say that a claim not raised in a postconviction petition is forfeited on appeal. This is because "forfeiture applies to issues that could have been raised but were not," whereas "waiver is the intentional relinquishment or abandonment of a known right." *People v. Phipps*, 238 Ill. 2d 54, 62 (2010). We will use the term forfeiture unless directly quoting the Act or case law that uses the term "waiver."

¶ 27 The only part of defendant's petition that might be construed as alleging actual innocence is his claim that "[t]he use of Mr. Hemphill's perjurious testimony *** was in violation of the defendants' [*sic*] due process rights." See *People v. Shaw*, 2019 IL App (1st) 152994, ¶ 44 (the wrongful imprisonment of an innocent person violates his right to due process under the Illinois Constitution). However, even construed liberally and in defendant's favor (see *Sanders*, 2016 IL 118123, ¶ 31), this allegation is not tantamount to a claim of actual innocence. Rather, it suggests that Hemphill testified falsely about being able to identify defendant as the shooter when, in truth, he only identified defendant because police led him to do so through coercion and a suggestive lineup and photo array.[2] One coerced identification does not amount to actual innocence, particularly when Ramirez also identified defendant shortly after the shooting, and when DNA evidence and a driver's license connected defendant to the BMW at the scene. We cannot substitute defendant's argument on appeal that he is innocent of shooting Hemphill for his petition's argument that Hemphill testified untruthfully at trial. See *People v. Williams*, 2015 IL App (1st) 131359, ¶ 10. These arguments are not necessarily inconsistent, but they are different. See *Reed*, 2014 IL App (1st) 122610, ¶ 59. Defendant's postconviction petition did not raise a claim of actual innocence, so he has forfeited that claim on appeal. See 725 ILCS 5/122-3 (West 2018).

¶ 28 The only authority that defendant cites in support of excusing the forfeiture of his actual innocence claim is our supreme court's decision in *People v. Holman*, 2017 IL 120655, ¶ 32. The supreme court has supervisory authority to excuse forfeiture in postconviction proceedings, but we do not. *People v. Jones*, 213 Ill. 2d 498, 507-08 (2004). *Holman* does not stand for the

---

[2] To the extent that defendant attempts to premise an actual innocence claim on perjury by Hemphill, Hemphill's affidavit does not admit that he testified falsely. It merely states that he now has "second thoughts" about his identification of defendant.

proposition that we, as an appellate court, can excuse defendant's failure to raise a claim of actual innocence in his postconviction petition. Even if it did, *Holman* is distinguishable because it addressed an as-applied constitutional challenge to the life sentence of a juvenile defendant under *Miller v. Alabama*, 567 U.S. 460 (2012), not a claim of actual innocence. *Holman*, 2017 IL 120655, ¶ 1.

¶ 29    Defendant also argues that his actual innocence claim is "ripe" for consideration on appeal because the State addressed actual innocence in its motion to dismiss and the circuit court addressed actual innocence in its order dismissing his petition.[3] Defendant cites no authority supporting the proposition that the State or a circuit court can preserve an actual innocence claim on a defendant's behalf. On the contrary, the Act places the burden on defendant to raise his claims in his petition (see 725 ILCS 5/122-3 (West 2018)), which defendant did not do with respect to his actual innocence claim. We are mindful of our supreme court's repeated instructions that we cannot overlook the forfeiture provision of the Act, and that we do not have the authority to address postconviction claims raised for the first time on appeal. See, e.g., *Jones*, 213 Ill. 2d at 506; *People v. Pendleton*, 223 Ill. 2d 458, 475 (2006). Accordingly, we find that defendant has forfeited his claim of actual innocence.[4]

¶ 30                                    B. *Brady* Violation

---

[3] The State's motion to dismiss defendant's petition specifically noted that defendant had *not* raised a claim of actual innocence. The circuit court's order explained that defendant's petition was not clear about whether defendant was alleging a constitutional violation or actual innocence.

[4] We note that, because defendant did not raise an actual innocence claim in his petition, *res judicata* would not bar him from raising such a claim in a successive petition. See *People v. Kines*, 2015 IL App (2d) 140518, ¶ 21 (*res judicata* only applies when there is a final judgment on the merits of a claim).

¶ 31 Defendant also argues that the State violated *Brady v. Maryland*, 373 U.S. 83 (1963), by "not tendering [to] defense counsel Hemphill's statements to police detailing his doubts about his identification of [defendant]." This claim does not concern any statements by Hemphill that exist in the record.[5] Rather, defendant appears to assume that Hemphill must have told police that he felt doubt and confusion about identifying defendant as the shooter.

¶ 32 Under *Brady*, the State has an affirmative duty to disclose exculpatory evidence that is material to guilt or punishment. *Brady*, 373 U.S. at 87. To establish a *Brady* violation, the defendant must show that the evidence was favorable to him, the State failed to disclose the evidence in response to a specific request, and the evidence was material. *People v. Chears*, 389 Ill. App. 3d 1016, 1028-29 (2009). Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defendant, the result of the proceeding would have been different. *Id.* at 1029. A defendant may raise a *Brady* claim in a postconviction petition. *People v. Ledbetter*, 342 Ill. App. 3d 285, 287 (2003).

¶ 33 Hemphill's affidavit does not allege that he made any statements to police other than identifying the man who shot him. He does not claim that he ever told anyone that he had doubts about identifying defendant, that he was confused, or that he felt pressured by police. The affidavit does not claim that there are any written or recorded versions of such statements that the State could or should have disclosed. Defendant simply assumes that such statements exist because, if Hemphill felt confused or doubtful during the photo array or lineup, then he must have said that to

---

[5] During trial, defendant attempted to use a typewritten statement that Hemphill provided to police, which indicated that he had some familiarity with defendant but did not know his name. The trial court sustained the State's objection and did not allow defendant to use this statement, so the statement is not included in the record on appeal. Regardless, this statement cannot be the subject of defendant's *Brady* claim because the State clearly disclosed it to him.

police. A *Brady* claim must be founded upon more than speculation. *People v. Pecoraro*, 175 Ill. 2d 294, 315 (1997);  see also *People v. Velez*, 123 Ill. App. 3d 210, 219 (1984) (speculation by a defendant that he might have been able to use the information in question does not establish materiality under *Brady*). Because defendant cannot identify any actual, extant statements that Hemphill made to police, we cannot evaluate whether those statements were favorable and material. See *People v. Mahaffey*, 194 Ill. 2d 154, 174 (2000) ("defendant cannot properly claim that the State violated the *Brady* rule by failing to disclose information that was unavailable at the time") (overruled on other grounds by *People v. Wrice*, 2012 IL 111860). Defendant's *Brady* claim fails.

¶ 34    Defendant insists that "Hemphill expressed uncertainty and confusion to the police" and that "Hemphill's affidavit indicates that he made such a statement to police when he expressed doubt about his identification." This is not a fair or accurate reading of Hemphill's affidavit. The affidavit contains information about what police told Hemphill and how Hemphill felt, but it does not, at any point, claim that Hemphill expressed uncertainty or confusion *to police*. While we take Hemphill's affidavit as true at this stage, we cannot add to it information that simply is not there.

¶ 35    Defendant also relies on *People v. Coleman*, 183 Ill. 2d 366 (1998), but that case undermines his argument in support of his *Brady* claim. In *Coleman*, the defendant's postconviction petition alleged that the State violated *Brady* by failing to disclose a witness's statements to both police and prosecutors that the defendant did not look like the gunman she saw leaving an apartment building following a shooting. *Coleman*, 183 Ill. 2d at 389. The witness submitted an affidavit attesting that she made such statements to police and prosecutors, which the supreme court found supported a substantial showing of a *Brady* violation. *Id.* at 396. By contrast,

Hemphill's affidavit contains no information about what, if anything, he told police. *Coleman* does not compel reversal. On the contrary, it illustrates that a witness must attest that he did, in fact, make certain statements to support a *Brady* claim premised on the State's failure to disclose such statements. Accordingly, the circuit court properly dismissed defendant's *Brady* claim.

¶ 36                    C. Unreasonable Assistance of Postconviction Counsel

¶ 37    As an alternative to his actual innocence and *Brady* claims, defendant contends that postconviction counsel rendered unreasonable assistance by (1) submitting an affidavit from Hemphill that was insufficient to support defendant's claims, (2) failing to support defendant's claim that the lineup and photo array were impermissibly suggestive, (3) arguing for an incorrect standard of review, and (4) failing to argue the ineffectiveness of counsel on direct appeal for failing to argue trial counsel's ineffectiveness.

¶ 38    There is no constitutional right to counsel in postconviction proceedings. *People v. Johnson*, 2018 IL 122227, ¶ 16. The Act does not provide for any specific level of assistance, but our supreme court has held that defendants are entitled to "reasonable" assistance at the second stage of postconviction proceedings. *Id.* This standard applies to privately retained counsel.[6] *People v. Smith*, 2022 IL 126940, ¶ 32. Illinois courts have not defined "reasonable assistance" in the context of postconviction proceedings, but we have employed an analysis analogous to that of *Strickland* v. *Washington*, 466 U.S. 668 (1984), which asks whether postconviction counsel should have taken certain actions and whether the failure to do so prejudiced the defendant. *People v.*

---

[6] Illinois Supreme Court Rule 651(c) (Ill. S. Ct. R. 651(c) (eff. July 1, 2017)) does not apply in this case because defendant did not file a *pro se* postconviction petition that was later amended by counsel. Rather, retained postconviction counsel filed the only petition at issue. See *People v. Zareski*, 2017 IL App (1st) 150836, ¶ 51 ("Our Supreme Court has held that Rule 651 applies to counsel appointed or retained after a *pro se* petition, but not to counsel that was privately retained by the prisoner to file the initial petition.")

*Zareski*, 2017 IL App (1st) 150836, ¶ 61 ("[W]e will examine not just whether [counsel] should have presented or amended the claims, but also whether [counsel]'s failures caused prejudice. We will follow *Strickland*'s familiar standard to do so."). Although we follow *Strickland*'s general formula, we note that the level of assistance required from postconviction counsel is "significantly lower than the one mandated at trial by our state and federal constitutions." *People v. Custer*, 2019 IL 123339, ¶ 30.

¶ 39                                   1. Sufficiency of Hemphill's Affidavit

¶ 40    Defendant first contends that postconviction counsel rendered unreasonable assistance by submitting an affidavit from Hemphill that was insufficient to support defendant's actual innocence and *Brady* claims. In his motion to reconsider the dismissal of defendant's postconviction petition, counsel explained that the contents of this affidavit were "as far as Mr. Hemphill would go in an affidavit." That is, Hemphill was careful to attest to only what he could truthfully state under oath and was understandably reluctant to attest that he testified falsely at trial, as defendant's petition claims. We cannot fault postconviction counsel for Hemphill's caution. Our supreme court has long held that, " '[a]bsent a showing of available materials for supporting affidavits, a failure to present affidavits obviously cannot be considered a neglect by the attorney.' " *People v. Malone*, 2017 IL App (3d) 140165, ¶ 10 (quoting *People v. Stovall*, 47 Ill. 2d 42, 46 (1970)). In other words, if Hemphill was not willing or able to attest to more than he did, that does not mean that postconviction counsel was neglectful. To whatever extent defendant suggests that postconviction counsel should have encouraged Hemphill to admit to perjury under oath, we reject that proposition.

¶ 41 The cases that defendant cites are distinguishable and do not support a finding of unreasonable assistance. See, e.g., *People v. Nitz*, 2011 IL App (2d) 100031, ¶ 19 (postconviction counsel submitted an affidavit that was not notarized); *People v. Ross*, 2015 IL App (3d) 130077, ¶ 17 (postconviction counsel filed no affidavits in support of the defendant's petition) (abrogated by *People v. Young*, 2018 IL 122598). Accordingly, we reject this claim of unreasonable assistance of postconviction counsel.

¶ 42                2. Failure to Support Suggestive Identification Claim

¶ 43 Defendant also contends that postconviction counsel "should have added photographic evidence and case law finding similar [identification] procedures suggestive" when the State argued that his petition failed to establish the suggestiveness of the photo array and lineup. He complains that "[a]side from a copy of a photograph of just [defendant], counsel did not provide any other support for the assertion that the photo array and lineup were suggestive." Defendant fails to establish prejudice with respect to this claim. See *Zareski*, 2017 IL App (1st) 150836, ¶ 61. The circuit court's written order dismissing defendant's petition analyzes both the photo array and a photograph of the lineup and concludes that neither identification procedure was impermissibly suggestive. Regarding the photo array, the court explained that each of the six individuals depicted had similar skin tone, hair style, and clothing. As to the lineup, the court stated that all four participants were seated and had approximately the same height, build, and skin tone. In addition, the participants were wearing similar baseball caps, hooded sweatshirts, long pants, and gym shoes. So postconviction counsel's failure to attach the photo array and a photograph of the lineup did not prevent the circuit court from addressing defendant's suggestive identification claim on the

merits because the court had access to those exhibits and clearly reviewed them.[7] Accordingly, we reject this claim of unreasonable assistance.

¶ 44                          3. Misapprehension of Postconviction Law

¶ 45    Defendant next contends that postconviction counsel rendered unreasonable assistance by arguing that the circuit court should view his petition "in the light most favorable to the non-moving party." The record reflects that, in response to the State's motion to dismiss, postconviction counsel argued that "the Court must look at any factual allegations made by the state in their Motion to Dismiss in the light most favorable to the non-moving party," *i.e.*, to defendant. That is essentially a correct, if somewhat confusing, statement of the law. See *Sanders*, 2016 IL 118123, ¶ 31. Moreover, defendant cannot establish prejudice with respect to this claim. There is no indication that the circuit court applied an improper standard in reviewing defendant's petition. The court's written dismissal order correctly states that "[a]ll well-pleaded facts that are not positively rebutted by the trial record are to be taken as true at a second stage dismissal hearing," citing *People v. Coleman*, 183 Ill. 2d 366 (1998). Accordingly, this claim of unreasonable assistance of postconviction counsel fails.

¶ 46                  4. Failure to Raise Ineffectiveness of Appellate and Trial Counsel

¶ 47    Finally, defendant argues that postconviction counsel provided unreasonable assistance by failing to argue that counsel on direct appeal rendered ineffective assistance by failing to argue

---

[7] Defendant also contends that postconviction counsel should have argued that counsel on direct appeal was ineffective for failing to argue trial counsel's ineffectiveness for failing to raise the suggestiveness of the photo array and lineup. The circuit court presumably would have reached the same conclusion about the merits of the suggestive identification claim, *i.e.*, that the photo array and lineup were not impermissibly suggestive. Framing this claim as ineffective assistance of counsel on direct appeal would not have changed the ultimate result, so defendant suffered no prejudice. See *People v. Johnson*, 206 Ill. 2d 348, 378 (2002)

that trial counsel provided ineffective assistance with respect to two issues. Specifically, defendant contends that trial counsel (1) failed to challenge the constitutionality of his arrest pursuant to an investigative alert and (2) elicited testimony from Hemphill that bolstered his identification of defendant. We evaluate claims of ineffective assistance of trial and appellate counsel under the two-part test of *Strickland*, which requires a showing that counsel's performance was objectively unreasonable and that it prejudiced the defendant. *People v. Johnson*, 206 Ill. 2d 348, 378 (2002). It is reasonable for postconviction counsel to not raise meritless claims of ineffective assistance of appellate counsel for failing to raise trial counsel's ineffectiveness. See *Pendleton*, 223 Ill. 2d at 472. Ultimately, defendant must establish that these claims would have been meritorious if trial counsel had raised them. See *Johnson*, 206 Ill. 2d at 378 ("[U]nless there is merit to petitioner's underlying claim, he can have suffered no prejudice from counsel's failure to raise it on direct appeal.").

¶ 48   With respect to challenging the constitutionality of defendant's arrest pursuant to an investigative alert, defendant must show that the unargued motion to quash arrest was meritorious and that a reasonable probability exists that the outcome of the trial would have been different had the arrest been quashed. See *People v. Sherman*, 2020 IL App (1st) 172162, ¶ 27. In this case, a motion to quash defendant's arrest premised on the unconstitutionality of investigative alerts would not have been legally meritorious. An arrest pursuant to an investigative alert was not unconstitutional between defendant's arrest in May 2013 and his trial in June 2015, the period in which trial counsel could have filed a motion to suppress. Although some divisions of this Court have expressed concerns about the use of investigative alerts (see, e.g., *People v. Starks*, 2014 IL App (1st) 121169, ¶ 77), they were not declared unconstitutional. In 2019, four years after

defendant's trial, a division of this Court held that "an arrest [is] unconstitutional when effectuated on the basis of an investigative alert issued by the Chicago Police Department" (*People v. Bass*, 2019 IL App (1st) 160640, ¶ 71), but our Supreme Court recently vacated that analysis (*People v. Bass*, 2021 IL 125434, ¶ 31). Even if trial counsel had some reason to challenge the constitutionality of defendant's arrest in or after 2019, the law would not have supported such a challenge. In 2019, we rejected *Bass* as wrongly decided and held that the use of an investigative alert to arrest an individual is constitutional so long as the investigative alert is supported by probable cause. *People v. Braswell*, 2019 IL App (1st) 172810, ¶ 39. *Braswell*, unlike *Bass*, remains good law, and this Court has followed the reasoning of *Braswell* in recent years. See, e.g., *People v. Little*, 2021 IL App (1st) 181984, ¶¶ 63-64; *People v. Simmons*, 2020 IL App (1st) 170650, ¶¶ 62-64; *People v. Bahena*, 2020 IL App (1st) 180197, ¶¶ 59-64; *People v. Thornton*, 2020 IL App (1st) 170753, ¶¶ 45-50. Defendant does not dispute this timeline of the constitutionality of investigative alerts. A challenge to the constitutionality of defendant's arrest premised on police use of an investigative alert would have been unsupported by the law at any time and, therefore, is meritless. Counsel on direct appeal was not ineffective for deciding not to argue trial counsel's ineffectiveness on this issue, nor was postconviction counsel unreasonable for choosing not to argue appellate counsel's ineffectiveness.

¶ 49 Second, defendant argues that trial counsel rendered ineffective assistance by eliciting testimony on cross-examination that Hemphill had seen defendant in the area before, making his identification of defendant more reliable. "The decision of whether and how to conduct a cross-examination is generally a matter of trial strategy, which cannot support a claim of ineffective assistance of counsel." *People v. Tolefree*, 2011 IL App (1st) 100689, ¶ 34. On direct examination,

Hemphill testified that he did not "know" defendant from the area, was not "acquaintances" with him, and never had "problems" with him. On cross-examination, trial counsel asked whether Hemphill had ever "seen" defendant before, and Hemphill responded that he had "see[n] [defendant] in the area like his face *** but I don't know him." It appears that trial counsel was attempting to extend Hemphill's testimony that he did not *know* defendant into a more helpful answer that he had never *seen* defendant before. Counsel did not get the answer that he hoped for, but trial strategy is not always perfect. We see no reason to depart from the general rule that an issue of trial strategy cannot support a claim of ineffective assistance. See *People v. Houston*, 226 Ill. 2d 135, 144 (2007) (under *Strickland*, there is a strong presumption that counsel's conduct was sound trial strategy). Moreover, Hemphill's testimony that he had seen defendant before was brief; it consists of approximately half a page in a 31-page cross-examination. Defendant has failed to establish that this small point of cross-examination prejudiced him within the meaning of *Strickland*. Accordingly, we find that this claim of ineffective assistance of trial counsel has no merit.

¶ 50                                    III. CONCLUSION

¶ 51    For the foregoing reasons, we affirm the second-stage dismissal of defendant's postconviction petition.

¶ 52    Affirmed.